UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Case Nos. | 4:18 CR 1018 JAR (JMB) |
| GHUFRAN JABER, | ) | | 4:18 CR 1029 JAR (JMB) |
| | ) | | |
| Defendant. | ) | | |

**MEMORANDUM, ORDER, AND RECOMMENDATIONS OF MAGISTRATE JUDGE**

Defendant Ghufran Jaber is charged in two different Indictments with various forms of health care fraud.[1]  Currently before the Court are the following motions filed on behalf of Jaber: (1) motion to dismiss the Indictment in Case No. 4:18 CR 1018 JAR (ECF No. 61); (2) motion to dismiss the Indictment in Case No. 4:18 CR 1029 JAR (ECF No. 38); (3) motion for bill of particulars with respect to the Indictment in Case No. 4:18 CR 1029 JAR (ECF No. 43); (4) motion to suppress statements in both cases (ECF Nos. 62 and 39 respectively).  The government opposes each motion.  Pretrial matters have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).

**RELEVANT PRODECURAL BACKGROUND**

Jaber is charged in two separate indictments with crimes which the undersigned will generally refer to as health care fraud.  According to the government, Jaber provided home

---

[1] Defendant is identified as "Ghufran Jaber" in Case No. 4:18 CR 1018 JAR and "Ghufran Abdallah Jaber" in Case No. 4:18 CR 1029 JAR.  The two cases have been consolidated for trial, meaning that the trials will be held simultaneously.  (See, e.g., ECF No. 98 in Case No. 4: 18 CR 1018 JAR)  Because the factual and legal issues involved in this case substantially overlap, the same Memorandum, Order, and Recommendation will be filed in both cases.

health services to various persons in the Eastern District of Missouri.  The essence of the charges is that Jaber submitted false claims for services she did not provide.

The Indictment in Case No. 4:18 CR 1018 JAR alleges that a person named Haider Albab[2] received "Personal Care Services and Homemaker Chore Services, … referred to as 'home health services,' through the Missouri Medicaid Program between February 1, 2013 and September 30, 2018."  (ECF No. 1 at ¶ 6)  That Indictment further alleges that, between June 2016 and November 2017, Jaber provided home health services to Albab.  Count 1 alleges that Jaber and Albab conspired to defraud a health benefit program (i.e., Missouri Medicaid), in violation of 18 U.S.C. § 1349, by submitting falsified time sheets claiming that Jaber provided services to Albab on dates when Albab was, in fact, out of the United States.  Counts 2 and 3 of the Indictment in Case No. 4:18 CR 1018 JAR allege individual acts of health care fraud, in violation of 18 U.S.C. § 1347, based on the same conspiracy alleged in Count 1.  Counts 4 and 5 allege specific instances of false statements Jaber made in relation to a health care program, in violation of 18 U.S.C. § 1035(a)(2), also based on the same conduct alleged in Count 1.

The Indictment in Case No. 4:18 CR 1029 JAR is similar in that it alleges that Jaber provided false information in connection with services provided pursuant to the Missouri Medicaid Program.  This second Indictment alleges a single scheme to commit health care fraud, in violation of 18 U.S.C. § 1347, with ten specific instances charged in Counts 1-10.  The second Indictment alleges that Jaber submitted false claims for home health services regarding the clients listed in each specific count.

---

[2] Albab was named as a co-defendant in Case No. 4:18 CR 1018 JAR.  The government dismissed the charges against Albab.  (ECF No. 81 in Case No. 4:18 CR 1018 JAR)

On June 26, 2019, the Court held an evidentiary hearing on Jaber's motions.  Jaber was present with Justin Gelfand, her attorney for both cases.  The government was represented by AUSA Tracy Berry.  Ms. Samira Hicks interpreted the proceedings for Jaber who speaks Arabic.  The government presented the testimony of one witness, Julie Pleimann, an investigator with the Special Investigations Unit of the Missouri Department of Health and Senior Services.  The government also introduced the following exhibits:[3]

Gov't Exh. 1   Resume of Julie Pleimann, Investigator
Gov't Exh. 2   Report of Investigation by Julie Pleimann (partial copy)
Gov't Exh. 4   CD-ROM – Recording of Interview of Ghufran Jaber (initial interview)
Gov't Exh. 5   CD-ROM – Recording of Interview of Ghufran Jaber (continuation of interview)
Gov't Exh. 6   Copy of ID Badge/Credentials of Julie Pleimann

Defense counsel cross examined Investigator Pleimann extensively and offered one exhibit, namely Def. Exh. A – Report of Investigation of Julie Pleimann (full copy).

At the conclusion of the hearing, the parties indicated that they would rest on their briefs with respect to Jaber's motions to dismiss the indictments and motion for a bill of particulars.  The parties requested leave to file post-hearing memoranda with respect to Jaber's motions to suppress statements.  Those memoranda have now been filed.

Based on the testimony and evidence adduced at the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witness, having carefully reviewed the exhibits submitted by both parties, and having fully considered the parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, order, and recommendation.

---

[3] There was no Government Exhibit 3 offered or admitted into evidence.

## **FINDINGS OF FACT**

Defendant Ghufran Jaber is originally from Jordan, speaks Arabic, and has limited English-language skills.  Jaber also has a limited formal education and purports to be illiterate. According to the government, Jaber worked as a home health care aid in and around the St. Louis area.

Julie Pleimann was the sole witness at the June 26, 2019, evidentiary hearing.  Pleimann is an investigator with the Missouri Department of Health and Senior Services.  At all times relevant to the matters currently before the Court, Investigator Pleimann's official title was "Investigator II" and her duties included investigating allegations of abuse and neglect and Medicaid fraud in relation to elderly and disabled persons in Missouri.  (See Gov't Exhs. 1, 6)

Investigator Pleimann testified that, on May 11, 2018, she initiated an investigation of Jaber as a result of a tip made to a hotline in Jefferson City, MO.  The tip involved allegations of falsified timesheets.  (See Gov't Exh. 5)  On June 18, 2018, Investigator Pleimann interviewed Jaber.  (See Gov't Exhs. 4, 5)  On June 19, 2018, Investigator Pleimann submitted her Report of Investigation.  (See Gov't Exh. 5 and Def. Exh. A)

Investigator Pleimann's June 18th interview of Jaber occurred at the home of Khelood Alyahya.  Alyahya was one of Jaber's home health care clients.  Investigator Pleimann intended to interview both Alyahya and Jaber; she timed her interview to coincide with a time when she expected Jaber to be present.  Prior to the interview, Investigator Pleimann requested the assistance of an Arabic-language interpreter.  Investigator Pleimann selected an interpreting service—Bilingual International—and that service provided the interpreter.  The interpreter

accompanied Investigator Pleimann and interpreted the interviews.[4]  When Investigator Pleimann arrived at Alyahya's home, Jaber was not present.  Investigator Pleimann interviewed Khelood Alyahya first.  That interview was recorded.  (See Gov't Exh. 4)  After completing that interview, Investigator Pleimann turned off her recorder while waiting for Jaber to arrive.

When Jaber arrived, Investigator Pleimann re-activated her recorder.  Investigator Pleimann told Jaber that she worked for the State of Missouri and that she needed to speak with Jaber.  Investigator Pleimann advised Jaber that Pleimann's job was to make sure that Jaber was doing her job.  The recording of the interviews indicates that Investigator Pleimann was courteous and cordial for the entire time she interacted with both Alyahya and Jaber.  Investigator Pleimann's statements and conduct reflect an effort to avoid offending Alyahya and Jaber.  For example, Investigator Pleimann advised each interviewee when she was going to physically approach them to show them documents.  The recording also reflects that the interaction was not confrontational.  Investigator Pleimann asked Jaber numerous open-ended questions.  Investigator Pleimann also prepared documents to show Jaber and explained to Jaber how those documents and circumstances indicated that Jaber had provided false timesheet information.  For example, Investigator Pleimann explained that Jaber had provided timesheets indicating she provided services for a client who was in the hospital and, therefore, not home to receive Jaber's services.

At no time during the interview did Investigator Pleimann advise Jaber of any of the so-called Miranda rights.  Investigator Pleimann did not tell that Jaber was free to leave or that Jaber did not have to answer her questions.  Investigator Pleimann was not armed, did not display any badge, but her official identification card was likely visible from a lanyard around her neck.  (See

---

[4] Investigator Pleimann testified that Jaber used some limited English, such as "yes" and "no."

Gov't Exh. 6)  Investigator Pleimann never restrained Jaber's freedom of movement in any way. To the contrary, Jaber was allowed to make a call.  Investigator Pleimann did not know the extent of Jaber's education but understood that she had a limited ability to read or write. Investigator Pleimann was not aware that persons from Jordan do not believe that they are free to disregard questions from government officials.

At one point during the interview, Jaber stated something that the interpreter translated as "I quit."  Investigator Pleimann testified that she did not take Jaber's statement as an indication that she wanted to terminate the interview, but rather as a reference to providing home health services.  Having reviewed the recording of that interview, the undersigned credits Investigator Pleimann's testimony regarding the context of Jaber's statement, "I quit."  Shortly after Jaber used the word "quit," she also apologized for anything wrong.  Later in the interview, Jaber again stated that she quit a prior client and only worked for Kheelood Alyahya.

Investigator Pleimann is not a law enforcement officer with arrest power and she never suggested that Jaber might be arrested.  Rather, Investigator Pleimann explained to Jaber what would happen after the interview.  This explanation involved administrative matters.  For example, Investigator Pleimann explained that she would write a report and send it to Health and Senior Services in Jefferson City, Missouri.  Thereafter, authorities would decide what action to take against Jaber.  Investigator Pleimann stated that she did not know what would happen, but she believed it likely that Jaber would eventually be banned from providing home health care services.  Investigator Pleimann also advised that the agencies Jaber worked for would have to payback any improperly paid funds.

The Jaber interview continued until Investigator Pleimann completed her questioning and turned off her recorder.  As Investigator Pleimann was leaving the residence, Jaber approached

-6-

her, touched her arm, and indicated that she wished to continue her conversation with Investigator Pleimann.  At that point, Investigator Pleimann re-activated her recorder and continued her discussion with Jaber.  (See Gov't Exh. 5)  After concluding her discussion, Investigator Pleimann left the residence.  Jaber was not arrested or restrained in any way.

On June 19, 2018, one day after interviewing Jaber, Investigator Pleimann submitted her report to an Office of General Counsel with the Missouri Department of Health and Senior Services, and she made a referral to Missouri Medicaid Audit and Compliance.  (See Gov't Exh. 2)  Investigator Pleimann did not make any direct referral to any criminal law enforcement agency, but her report listed Jaber as a "suspect."  Investigator Pleimann did not become aware of a criminal investigation involving Jaber until sometime in the fall of 2018.

Additional findings of fact are included in the discussion below.

## DISCUSSION

### I.    Motion to Dismiss Indictments

Jaber moves the Court to dismiss all charges in both Indictments for failure to state an offense.  Jaber advances substantially the same argument relative to both Indictments. According to Jaber, even if the Court accepts each of the allegations as true, the Indictments are fatally flawed because Jaber never defrauded, obtained money from or under the control of, or made a false statement to a "health care benefit program."  Rather, according to Jaber, the government merely alleges that Jaber defrauded, obtained money under the control of, or made false statements to her employers, not to the Missouri Medicaid Program.  According to Jaber, "it is legally insufficient for the Government to merely infer that Jaber's employers received money from Medicaid and that, therefore, the money the employers subsequently paid Jaber—i.e. her wages—constituted Medicaid funds."  (See Case No. 4:18 CR 1018 JAR, ECF No. 61 at p. 4)

The government contends that Jaber's argument is, in essence, a contention that the government cannot prove the elements of the charged offenses.  Further, the government argues that none of the charged offenses require a defendant to present false information (e.g., false timesheets) directly to the health care benefit program (in this case, Medicaid), or receive funds directly from that program.

"An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which [she] must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution."  United States v. Steffan, 687 F.3d 1104, 1109 (8th Cir. 2012) (citations and quotations omitted); see also Hamling v. United States, 418 U.S. 87, 117 (1974).  Indictments are not reviewed "in a hyper technical fashion and should be 'deemed sufficient unless no reasonable construction can be said to charge the offense.'"  United States v. O'Hagan, 139 F.3d 641, 651 (8th Cir. 1998) (quoting United States v. Morris, 18 F.3d 562, 568 (8th Cir. 1994)).  "Furthermore, '[a]n indictment is normally sufficient if its language tracks the statutory language."  United States v. Hayes, 574 F.3d 460, 472 (8th Cir. 2009) (quoting United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008)).  An indictment is insufficient on its face if a substantive essential element is omitted.  See Sewell, 513 F.3d at 821.  "If an essential element of the charge has been omitted from the indictment, the omission is not cured by the bare citation of the charging statute."  United States v. Zangger, 848 F.2d 923, 925 (8th Cir. 1988); see also O'Hagan, 139 F.3d at 651 (quoting Zangger).

### A.    Indictment in Case No. 4:18 CR 1018 JAR

The Indictment in Case No. 4:18 CR 1018 JAR charges three different, but factually related crimes.  Count 1 charges Jaber with conspiracy to violate 18 U.S.C. § 1347 (health care

-8-

fraud), in violation of 18 U.S.C. § 1349.  Counts 2 and 3 charge Jaber with substantive violations of 18 U.S.C. § 1347.  Counts 4 and 5 charge Jaber with making false statements in relation to a health care program, in violation of 18 U.S.C. § 1035(a)(2).  The Court's analysis starts with a summary of the relevant charging statutes.

Section 1347 makes it a crime to knowingly and willfully execute or attempt to execute a scheme or artifice –

> (1) to defraud any health care benefit program; or
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.

Section 1349 makes it a crime to attempt or conspire to commit a violation of § 1347.  Under § 1035(a)(2) –

> Whoever, in any matter involving a health care benefit program, knowingly and willfully –
>
> ***
>
> (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be [guilty of an offense].

Pursuant to these statutes, each of the crimes alleged in the Indictment requires the government to allege and prove a connection to a health care benefit program.  The statutory definitions relating to federal health care fraud defines "health care benefit program" to mean –

> Any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. § 24(b).

As noted, the essence of Jaber's argument is that the charges fail to adequately allege that Jaber obtained money from any health care benefit program.[5]  More specifically, Jaber argues that

> [t]he government's theory appears to be that Jaber's alleged submission of inaccurate timesheets to her employers triggered a chain of events that ultimately resulted in Medicaid paying Jaber's employers for services not actually rendered. However, this alleged conduct simply does not constitute any of the crimes alleged in the indictment because Jaber did not obtain money from Medicaid— she allegedly received money from her employer.  The source of her employer's funds used to pay Jaber is unknown and not alleged.  Similarly, the indictment contains no allegation that Jaber made any false statements to Medicaid—she allegedly made false statements to her employers.

(ECF No. 61 at p. 3)

The Indictment is fairly characterized as a "speaking indictment."  For example, the Indictment begins with a nine paragraph introduction and each of the counts realleges those nine paragraphs.  This makes sense because the various charges in the Indictment all relate to the same operative set of facts and circumstances.  Paragraphs 1-5 generally describe the Missouri Medicaid Program and explain that the Program provides reimbursement for certain personal care and home care services to qualified beneficiaries.  Paragraph 6 alleges that, between February 1, 2013, and September 30, 2018, Haider Albab received "home health services" through the Missouri Medicaid Program and that, "[d]uring that time period, the Missouri Medicaid Program paid various licensed in-home health care agencies in excess of $109,000.00 for home health services allegedly provided to … Albab."  (ECF No. 1 at ¶ 6)  Paragraph 7 alleges that Jaber provided home health services to Albab between June 4, 2016, and November 5, 2017.  Paragraph 8 alleges that, "[b]ecause Albab affirmed to the home health agencies that …

---

[5] Jaber does not contend that any of the other elements of the charged offenses are lacking.  Accordingly, the undersigned focuses on the question of whether the charges in the Indictment sufficiently allege the requisite connection to a health care benefit program.

Jaber performed the claimed home health services, … Jaber received payments from his [sic] employers that were funded by the Missouri Medicaid program." (ECF No. 1 at ¶ 8)  The Indictment alleges that Jaber and Albab submitted false time sheets claiming that Jaber had provided home health services to Albab at times when Albab was not in the United States.  (See, e.g., ECF No. 1 at ¶¶ 11, 12, 14, 17, 18)

There is no dispute that the Missouri Medicaid Program is a health care benefit program.  The allegations in Count 1—the conspiracy count—sufficiently connect the dots and tie Jaber's alleged conduct to Missouri Medicaid Program funds.

Similarly, Counts 2, 3, 4, 5 each allege that –

[Jaber submitted] fraudulent time sheets to various home health agencies who were contracted by the State of Missouri Medicaid Program to provide home health services to … Albab….  Accepting the representations as true, the various home health agencies claimed entitlement to the payment of Medicaid funds from the State of Missouri….  [And] [t]he various home health agencies paid … Jaber based on upon their belief that … Jaber provided Medicaid eligible services.

(ECF No. 1 at ¶ 14b-d)

Jaber's argument does not address the fact that the Indictment adequately tracks the relevant statutory language.  See Hayes, 574 F.3d at 472.  Her arguments also do not consider that paragraphs 8 and 14 specifically allege that Jaber was paid by employers who were funded by Missouri Medicaid.  Rather, Jaber's arguments suggest that only persons who directly interact or directly submit false information to Missouri Medicaid, or who receive funds directly from Medicaid, can be held liable for the offenses charged.[6]  That argument cannot be sustained.

---

[6] The government contends that Jaber's argument is actually an attack on the sufficiency of the government's evidence.  The undersigned does not read Jaber's argument in that light.  To the extent Jaber's argument is construed as an attack on the sufficiency of the evidence, it would be premature.  Pretrial motions are ill-suited to test the sufficiency of the government's evidence.  See United States v. Seawood, 1:17CR42 SNLJ (ACL), 2018 WL 1611672 at *3 (E.D. Mo. Mar. 3, 2015) (explaining that, in criminal cases, a pretrial motion to dismiss is not a proper

The parties identified no cases from our Circuit that are directly on point.[7]  The Fifth

Circuit, however, addressed a fairly analogous situation in United States v. Girod, 646 F.3d 304

(5th Cir. 2011).  Girod involved an indictment charging "fraudulent Medicaid reimbursement

claims made through A New Beginning of New Orleans ('ANBNO'), … [an] organization that

provides minor, disabled Medicaid recipients with Personal Care Services ('PCS')."  Id. at 309.

Among those charged were two employees of ANBNO and Girod.  Girod had three children on

Medicaid who purportedly received PCS services from ANBNO.  Girod signed off on false PCS

time sheets for her children in exchange for kickbacks.  In particular,

> [t]he indictment charged Girod with creating false time sheets and PCS daily
> schedules for services she claimed to have witnessed for her children, with being
> paid by ANBNO and [a co-defendant] for "creating fraudulent documentation to
> support billings to Medicaid," and charged that in general false time sheets were
> made and ANBNO employees were not providing the PCS services claimed.

Id. at 313-14.  Girod did not submit anything directly to Medicaid or receive any funds directly

from Medicaid.

Girod argued that she could not be convicted on the health care charges because "there

was no proof offered that [she] actually authored or signed any of the documents filed with

Medicaid."  Id. at 313.  The Fifth Circuit rejected that argument, noting that "[t]he Government

is not required … to show that Girod herself submitted the forms to Medicaid in order to charge

---

mechanism to attack the sufficiency of the evidence) (citing United States v. DeLaurentis, 230
F.3d 659, 660 (3d Cir. 2000)).

[7] The closest case the undersigned identified from our Circuit is Hayes.  The defendant in
Hayes, like Jaber, was charged with submitting false information, including time sheets, for
reimbursement related to home health care services.  See 574 F.3d at 472-73.  The Eighth Circuit
found that the indictment was sufficient because it alleged each of the essential elements of the
charged offense.  The Court rejected Hayes's argument that the indictment failed to state a claim
of health care fraud because it did not allege a provider agreement between the provider and
Missouri Medicaid.  Id. at 473.  Accordingly, the Eighth Circuit affirmed our District Court's
denial of the defendant's motion to dismiss the indictment.  Id.

-12-

her with Medicaid fraud and conspiracy." Id. In Girod, therefore, the Fifth Circuit implicitly held that a person can defraud Medicaid by directly or indirectly providing false information to a Medicaid program.

The undersigned finds the reasoning of Girod persuasive and applicable to Jaber's case. Jaber may not have provided false home health care records/information directly to Missouri Medicaid, but the Indictment sufficiently alleges that she provided false information to her employers who were paid by Missouri Medicaid and that Jaber received payments from her employers. Thus, the undersigned finds that the Indictment sufficiently alleges that the funds falsely or fraudulently obtained came from a health care benefit program, namely Missouri Medicaid.[8]

The undersigned finds that each Count in the Indictment satisfies Rule 7(a) and includes sufficient information to permit Jaber to plead a conviction or an acquittal as a bar to a future prosecution. Jaber's motion to dismiss the Indictment in Case No. 4:18 CR 1018 JAR should be denied.

**B.      Indictment in Case No. 4:18 CR 1029 JAR**

The Indictment in Case No. 4:18 CR 1029 JAR charges Jaber with ten specific instances of health care fraud, in violation of 18 U.S.C. § 1347. The scheme alleged in this Indictment is that Jaber represented to various home health care agencies that she provided home health services to persons at times when, in fact, she did not provide such services.

---

[8] The parties have not addressed whether Jaber's employers—the home health agencies—would also qualify as health care benefit programs under the definition provided in 18 U.S.C. § 24(b). Therefore, the Court need not address this possibility.

Jaber's argument in support of her motion to dismiss the Indictment in Case No. 4:18 CR 1029 JAR is substantially the same as her argument in support of her motion to dismiss the Indictment in case No. 4:18 CR 1018 JAR.  For example, Jaber argues that she

> never defrauded or obtained money under the control of, any "heath care benefit program."  Rather, the Government's allegations within the four corners of the indictment are that Jaber defrauded and obtained money under the control of *her employers*—which the Government identifies as Harmony Care, Shae Home Care, We Care, ResCare, Victor's Home Care, and Forum Home Health Agency.

(ECF No. 1 at p.2, emphasis in original)

Each of the counts in the Indictment in Case No. 4:18 CR 1029 JAR sufficiently tracks the necessary statutory language.  See Hayes, 574 F.3d at 472.  To accept Jaber's arguments would require the Court to unduly discount the allegations in the Indictment.  For example, paragraph 7 alleges that the home health services at issue were provided through the Missouri Medicaid Program, and paragraph 8 alleges that Jaber provided home health services to the individuals through licensed providers of in-home health care.  Paragraph 10 alleges that the Missouri Medicaid Program paid the licensed in-home health care agencies, and paragraph 11 alleges that Jaber received Medicaid funded payments from these agencies as a result of services she claimed to have performed.

Again, there is no dispute that Missouri Medicaid is a "health care benefit program."  On any fair reading of the Indictment, it sufficiently alleges that Jaber's scheme resulted in her receiving funds from Missouri Medicaid for work she did not perform, albeit indirectly via various in-home health care agencies.  As explained above, the government need not allege that Jaber provided false information directly to Missouri Medicaid or be paid directly by Missouri Medicaid in order to sufficiently allege a violation of 18 U.S.C. § 1347.  See Girod, 646 F.3d at 313.

-14-

The undersigned finds that each Count in the Indictment satisfies Rule 7(a) and includes sufficient information to permit Jaber to plead a conviction or an acquittal as a bar to a future prosecution.  The undersigned recommends that the Court deny Jaber's motion to dismiss the Indictment in Case No. 4:18 CR 1029 JAR.

## II.    <u>Motion for Bill of Particulars in Case No. 4:18 CR 1029 JAR</u> (ECF No. 43)

In Case No. 4:18 CR 1029 JAR, Jaber asks the Court to direct the government to file a bill of particulars pursuant to Fed. R. Crim. P. 7(f).  Jaber contends that, absent a bill of particulars, she will be unable to ascertain the nature of the charges and unable to prepare a defense at trial.  Jaber argues that the Indictment alleges that some of her timesheets overlapped with other timesheets, thereby implying that some of the timesheets must have been false, but the Indictment fails to identify which specific timesheets were false.  The government contends that Jaber is misusing a motion for a bill of particulars for a discovery device.  The government contends that the Indictment and discovery provide sufficient information.

If a defendant believes that an indictment does not provide enough information to prepare a defense, then he or she may move for a bill of particulars."  <u>United States v. Livingstone</u>, 576 F.3d 881, 883 (8th Cir.) (citing Fed. R. Crim. P. 7(f)), <u>cert</u>. <u>denied</u>, 558 U.S. 1099 (2009).  "The purpose of a bill of particulars is to inform the defendant of the nature of a charge with sufficient precision to enable [her] to prepare for trial and to avoid or minimize the danger of surprise at trial."  <u>Id.</u>  It is well established that "a bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial."  <u>Id.</u>; <u>see</u> <u>also</u> <u>United States v. Huggans</u>, 650 F.3d 1210, 1220 (8th Cir. 2011) (quoting same), <u>cert</u>. <u>denied</u>, 565 U.S. 1202 (2012).

-15-

The Indictment in Case No. 4:18 CR 1029 JAR charges Jaber with ten separate violations of 18 U.S.C. § 1347 (health care fraud).  Each count rests on the same premise—Jaber submitted false claims for home health services on specific dates and with respect to specific clients, because on each alleged date, she was providing services for or travelling to visit other clients.  For example, Count 1 alleges that, on October 22, 2015, Jaber falsely claimed to be providing home health services to persons identified as M.A., M.M., and K.A., when she was actually providing services or travelling to other clients.  (See ECF No. 1 at p. 5)

Jaber's argument suggests that the charges in the Indictment allege that Jaber visited some but not all of the clients listed in each Count.  The undersigned does not believe the Indictment is fairly read in such a fashion.  Paragraph 14 alleges that Jaber executed a scheme to defraud "by claiming that [she] provided home health services to the client listed below [e.g., M.A., M.M., and K.A., in Count 1] during time periods when she was providing home health service to other clients or traveling to other clients' residences."  (ECF No. 1 at p. 4)  Thus, each count sufficiently identifies the specific false claims at issue.

As the undersigned reads the plain language of the Indictment in Case No. 4:18 CR 1029 JAR, the premise of Jaber's motion for a bill of particulars cannot be sustained.  Each Count specifically identifies which time sheets were false.  For example, Count 1 alleges that Jaber submitted false time sheets regarding services for clients M.A., M.M., and K.A. on October 22, 2015.[9]  The perceived infirmity Jaber raised in her motion for a bill of particulars is not present.

---

[9] Each count in the Indictment in Case No. 4:18 CR 1029 JAR refers to false time sheets for three or more different clients.  It is not clear to the Court whether Jaber submitted a single false time sheet for each date charged or separate time sheets for each client identified for each date charged.  In any event, Jaber does not contend that, as structured, these counts are duplicitous.  See United States v. Paul, 885 F.3d 1099, 1104 (8th Cir. 2018) ("Duplicity is the joining in a single count of two or more distinct and separate offenses.") (citation and internal quotations omitted).

-16-

Jaber's motion for a bill of particulars in Case No. 4:18 CR 1029 JAR is denied.

## III.   __Motion to Suppress Statements__[10]

On June 18, 2018, Julie Pleimann, an Investigator with the Special Investigations Unit of the Missouri Department of Health and Senior Services, interviewed Jaber at the home of Khelood Alyahya. Jaber asks the Court to suppress the statements she made to Investigator Pleimann. Jaber contends that she was in custody and did not receive any Miranda warnings. Jaber further contends that, at one point during the interview, she invoked her right to remain silent. The government counters that Jaber was not subjected to custodial interrogation for two reasons. First, according to the government, Investigator Pleimann is not a member of law enforcement and, therefore, she was not required to administer Miranda warnings because she did not "interrogate" Jaber. Second, the government contends that Jaber was never in custody. The government's response does not address the question of whether Jaber invoked her right to remain silent, but the hearing evidence and testimony sufficiently address that question.

Statements made to law enforcement officers during custodial interrogation are normally subject to the protections and procedures identified in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966). See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody …." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citation and quotation omitted). Miranda warnings are required when a suspect is both in custody and subjected to official questioning. See LeBrun, 363 F.3d at 720.

Although the government's initial argument in opposition was that Jaber was not entitled to Miranda warnings interrogated because Investigator Pleimann was not a law enforcement

---

[10] See ECF No. 62 in Case No. 4:18 CR 1018 JAR and ECF No. 39 in Case No. 4:18 CR 1029 JAR.

officer, the undersigned concludes Jaber's motion to suppress is more readily addressed on the straight-forward question of whether Jaber was in custody at the time of her interview. If she was not in custody, she was not entitled to any Miranda warnings, regardless of Investigator Pleimann's status.

"The ultimate question in determining whether a person is in 'custody' for purposes of Miranda is whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." United States v. Giboney, 863 F.3d 1022, 1027 (8th Cir.) (citation and quotations omitted), cert. denied, 138 S. Ct. 527 (2017). This determination is made from an objective standard. Id. Thus, the "'relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation.'" Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). This inquiry is guided by the so-called Griffin factors, which focus on six, non-exclusive considerations. See United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990). The Griffin factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Zavesky, 839 F.3d 688, 696 (8th Cir. 2016) (quoting Griffin, 922 F.2d at 1349), cert. denied, 137 S. Ct. 1388 (2017).

Applying these factors, the undersigned finds that Jaber was not in custody. First, although Jaber was not advised that questioning was voluntary, the interview occurred at the home of a third-party. In fact, Jaber was not present at first and came to that home on her own

(although she may not have known Investigator Pleimann was present and intended to interview her). Second, Jaber was not restrained at any time during the interview and permitted to make a telephone call. Third, Investigator Pleimann did not employ any strong arm tactics and the atmosphere was in no way police-dominated. Investigator Pleimann secured the services of an Arabic-speaking interpreter from a service she considered reliable.

Jaber focuses her attention to the fact that Investigator Pleimann told Jaber that she needed to speak with her and that Pleimann was wearing her credentials at the time. Jaber also asks the Court to consider a number of Jaber's subjective characteristics, including her upbringing in Jordan. Applying an objective standard, see Giboney, 863 F.3d at 1027, a reasonable person in Jaber's position would not construe Investigator Pleimann's conduct as restricting her movement to a degree anywhere near formal arrest. Finally, Jaber was not placed under formal arrest after the interview. To the contrary, after Investigator Pleimann completed her interview and was attempting to leave, Jaber approached her to continue the conversation.

These conclusions are supported by the audio recording of Investigator Pleimann's encounter with Jaber. Investigator Pleimann was cordial, non-confrontational, and she often took steps to try to ensure that she was in no way disrespectful to Jaber. Investigator Pleimann was also candid with Jaber and clearly explained that she was looking at allegations related to false time entries and explained to Jaber how the investigation would proceed after the interview. The evidence in this matter leads to a strong conclusion that Jaber was not in custody when Investigator Pleimann interviewed her on June 18, 2018.

Having concluded that Jaber was not in custody and, therefore, she was not entitled to any Miranda warnings, the Court will next consider whether Jaber invoked her Fifth Amendment right to remain silent at any time during the interview.

-19-

The Eighth Circuit has consistently explained that, "[t]o adequately invoke this right and effectively cut off questioning, a suspect must indicate a clear, consistent expression of a desire to remain silent." United States v. Adams, 820 F.3d 317, 323 (8th Cir. 2016) (citations and internal quotations omitted). Ambiguous or equivocal statements are not sufficient. Id. In assessing whether a suspect has invoked her right to remain silent, our Court considers the suspect's "statements as a whole." Id. For example, in Adams, the suspect said, "Nah, I don't want to talk man, I mean, I" and then proceeded to talk with the investigator. Id. The Eighth Circuit concluded that, when considered in its full context, the statement "I don't want to talk, man," was ambiguous. Id.

Jaber contends that, by saying "I quit" to Investigator Pleimann, she invoked her right to remain silent and all questioning should have ceased. Jaber's case is much easier to decide than the situation in Adams. Jaber did not mention talking with Investigator Pleimann or terminating the interview at all. Rather, she merely stated, "I quit." That statement, by itself, is ambiguous; but even more so when viewed in the context of her statements as a whole. As explained in the findings of fact above, Jaber stated "I quit," in the context of providing home health services, not in the context of terminating the interview. Thus, it would be unreasonable to interpret "I quit" in that context as an unequivocal and unambiguous invocation of a desire not to talk. This conclusion is reinforced by the fact that, after Investigator Pleimann concluded the interview, Jaber approached her indicating it was Jaber's desire to continue the conversation.

For the forgoing reasons, the undersigned finds that Jaber was not in custody when she was questioned on June 18, 2018. Because Jaber was not in custody, she was not entitled to any Miranda warnings. Also, at no time did Jaber invoke her right to remain silent. Therefore, the undersigned recommends that the Court deny Jaber's motion to suppress statements.

-20-

## <u>RECOMMENDATIONS AND ORDERS</u>

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Court **DENY** Defendant's Motion to Dismiss the Indictment [ECF No. 61] in Case No. 4:18 CR 1018 JAR.

**IT IS FURTHER RECOMMENDED** that the Court **DENY** Defendant's Motion to Dismiss the Indictment [ECF No. 38] in Case No. 4:18 CR 1029 JAR.

**IT IS FURTHER ORDERED** that Defendant's Motion for a Bill of Particulars [ECF No. 43] in Case No. 4:18 CR 1029 JAR is **DENIED**.

**IT IS FURTHER RECOMMENDED** that the Court **DENY** Defendant's Motion to Suppress Statements [ECF No. 62] in Case No. 4:18 CR 1018 JAR.

**IT IS FURTHER RECOMMENDED** that the Court **DENY** Defendant's Motion to Suppress Statements [ECF No. 39] in Case No. 4:18 CR 1029 JAR.

The parties are advised that they have fourteen (14) days in which to file written objections to this Memorandum, Order, and Recommendations, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

The trial of these matters has been set for Monday, November 4, 2019, at 9:00 a.m.

before the Honorable John A. Ross, United States District Judge.

/s/ **John M. Bodenhausen**

UNITED STATES MAGISTRATE JUDGE

Dated this __4th__ day of _September_, 2019